## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| ATLANTIC BASIN REFINING, INC., ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| ) | **Civil Action No. 2015-0071** |
| ARCLIGHT CAPITAL PARTNERS, LLC, ) | |
| and JP ENERGY PARTNERS, LP, ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————————) | |

**Attorneys:**
**Andrew C. Simpson, Esq.,**
**Emily A. Shoup, Esq.,**
St. Croix, U.S.V.I.
**Joseph P. Klock, Jr., Esq.,**
Coral Gables, FL
     *For Plaintiff*

**Charles E. Lockwood, Esq.,**
**George Hunter Logan, Esq.,**
St. Croix, U.S.V.I.
**Blair G. Connelly, Esq.,**
**Jessica D. Rostoker, Esq.,**
**Michael A. Watsula, Esq.,**
New York, NY
     *For Defendants*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendants ArcLight Capital Partners, LLC ("ArcLight") and JP Energy Partners, LP's ("JP Energy") (collectively "Defendants") "Motion to Dismiss or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404" (Dkt. No. 19); Plaintiff Atlantic Basin Refining, Inc.'s ("Plaintiff" or "ABR") "Response to Defendants' Motion to Dismiss" (Dkt. No. 30); and Defendants' "Reply Memorandum of Law" (Dkt. No. 34). For the reasons discussed below, the Court will grant in part and deny in part Defendants' Motion to

Dismiss or Transfer. Specifically, the Court will (1) deny Defendants' Motion to Dismiss based on the forum selection clause and the Motion to Transfer Pursuant to 28 U.S.C. § 1404; (2) grant Defendants' Motion to Dismiss Counts I, V, and VII with prejudice as barred by the Bankruptcy Court's Sale Order; (3) grant Defendants' Motion to Dismiss Count III with prejudice for failure to state a cause of action; (4) grant Defendants' Motion to Dismiss Counts II and IV, without prejudice, and with leave to amend, for failure to satisfy the *Iqbal/Twombly* pleading requirements; and (5) deny Defendant's Motion to Dismiss Count VI.

# I. BACKGROUND[1]

This case arises out of Plaintiff ABR's attempt to acquire Hovensa, LLC ("Hovensa"), the prior owner of an oil refinery and storage facility located in St. Croix, Virgin Islands. (Dkt. No. 14 ¶¶ 8, 11). Plaintiff is a Virgin Islands corporation with its principal place of business in St. Croix. *Id*. ¶ 1. Defendant ArcLight is a Delaware limited liability company with its principal place of business in Massachusetts. *Id*. ¶ 2. Defendant JP Energy is also a Delaware limited liability company with its principal place of business in Texas. *Id*. ¶ 3. ArcLight is a majority owner of JP Energy. *Id*. ¶ 4.

---

[1] In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged in the complaint and its attachments, and matters of public record. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Courts may also consider "an undisputedly authentic document . . . if the plaintiff's claims are based on the document." *Id*. Moreover, the facts as alleged in the complaint are taken as true for purposes of a motion to dismiss for failure to state a claim. *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d Cir. 2013); *Stapleton v. WenVI, Inc.*, 2014 WL 3765855, at *1 (D.V.I. July 30, 2014). The background facts here are taken from Plaintiff's Amended Complaint and its exhibits, exhibits attached to Defendants' Motion to Dismiss, and the record in the Hovensa bankruptcy case, *In re Hovensa*, L.L.C., Case No. 15-BK-10003 (D.V.I. Sept. 9, 2015), specifically, Hovensa's "First Day Motion" (Dkt. No. 15) and the Bankruptcy Court's "Sale Order" (Dkt. No. 394).

ABR tried to acquire Hovensa's oil refinery and related storage and terminal assets, which had operated in St. Croix since the 1960s until it ceased operations in 2012. *Id*. ¶¶ 8-11. After an intensive application process, and defeating 141 other candidates, ABR was designated as the purchaser and proceeded to negotiate a Purchase and Sale Agreement with Hovensa. *Id*. ¶¶ 19-23. Closing on the Purchase and Sale Agreement was conditioned on ABR entering into a new Operating Agreement with the Government of the Virgin Islands, which had to be ratified by the Legislature of the Virgin Islands. *Id*. ¶¶ 25, 28. However, the Legislature rejected the Operating Agreement on December 19, 2014. *Id* ¶ 28.

Securing a financial partner was a necessary component of ABR's ability to close on the Purchase and Sale Agreement with Hovensa. *Id*. ¶¶ 35-36. To that end, ABR introduced Defendants to the transaction and brought them on to be ABR's financial partner and co-equal partner in the operation of the terminal and storage facility. *Id*. ¶ 29. According to Plaintiff, identifying a financial partner and its joinder in the transaction was "time-sensitive." *Id*. ¶ 35. Plaintiff alleges that "[o]nce the financial partner had been identified, the timing of the sale process would preclude any opportunity for ABR to [secure a] replace[ment]." *Id*. Plaintiff further alleges that "Defendants knew [this] to be the case." *Id*.

Due to the "high value and uniqueness" of the confidential "business and operational plans, strategies, projections, financial models, engineering studies, and other information developed by ABR and its consultants" for the refinery and its related storage and terminal assets, ABR and ArcLight signed a Mutual Nondisclosure Agreement ("NDA") on February 10, 2015. *Id*. ¶¶ 30, 32; (NDA, Dkt. No. 14-1 Ex. A). The NDA expressly prohibited the use or disclosure of Confidential Information exchanged between the parties "except to evaluate and engage in

discussions concerning a potential business relationship between the parties." (NDA ¶ 3). Under

the NDA, "Confidential Information" was broadly defined as encompassing:

> [A]ny information concerning any verbal discussions and negotiations between ABR and JP Energy concerning the Opportunity,[2] and all business plans, models, notes, analyses, compilations, studies, interpretations, business platforms, strategic interests, customer information, vendor information, contractor information, pricing, trade secrets, proprietary data, data model(s), data integrators, business rules and any related adapters, technical data, designs, drawings, specifications, techniques, models, data, software processes and/or systems, documents, source code, object code, diagrams, flow-charts, research, development, processes, procedures, analysis and/or analytics, "know-how," new product or new technology information, prototypes, samples, information capable of being embodied in a patent application or copyright application or any international equivalent thereof, product copies, quantity of products and kind of products licensed, product returns, unannounced products, manufacturing, development or marketing techniques and materials, development or marketing timetables, strategies and development plans, including trade names, trademarks, customer, supplier or personal names and other information related to customers, suppliers or personnel, pricing policies, financial information, plant and equipment and other information of a similar nature, and any trade secrets or nonpublic business information disclosed by one Party to the other Party . . .

*Id.* ¶ 2. Publicly available information or information "already in the possession of the Receiving

Party . . . obtained by the Receiving Party from a third party . . . [or] independently developed by

the Receiving Party," was excluded by the NDA from being designated as "Confidential

Information." *Id.* ¶ 2.1. In addition, while nothing in the NDA committed the parties to proceed

with any partnership, *id.* ¶ 6, in the event of a breach of the non-disclosure or confidentiality

provisions, *id.* ¶¶ 3-4, the NDA authorized either party to obtain injunctive relief, monetary

damages, and any other remedies to which the party may be entitled at law. *Id.* ¶ 10. The NDA

---

[2] Per the NDA, "the Opportunity" was defined as a "business opportunity of mutual interest [that the parties wished to explore], namely potential terminalling, tank leasing, and potential crude oil supply . . . related to ABR's purchase of . . . 'Hovensa's Oil Refinery' and/or ABR's purchase of 100% of the membership interests of Hovensa, LLC." (NDA ¶ 1).

also contained a Choice of Law provision which stated that the Agreement "shall be governed by the laws of the State of Delaware." *Id.* ¶ 15.

In connection with the dealings between the parties and pursuant to the NDA, ABR disclosed Confidential Information to Defendants. (Dkt. No. 14 ¶ 34). According to Plaintiff, the materials "allowed Defendants to fully understand the economic opportunities afforded by the facility and to have access to a fully developed plan to realize those opportunities." *Id.*

On March 10, 2015, ABR, ABR's subsidiary Atlantic Basin Refining Holdings, LLC ("ABRH"), and JP Energy St. Croix, LLC, entered into a Letter Agreement "which included a structure for partnering on the [Hovensa] transaction." (Dkt. No. 14 ¶ 43; Letter Agreement, Dkt. No. 19 Ex. A).[3] The Letter Agreement contemplated, among other things, the formation of St. Croix Terminal ("SCT"), to be jointly owned by JP Energy St. Croix and ABR. (Dkt. No. 14 ¶¶ 41, 44). Under the partnership, ABRH—which was to acquire all of Hovensa's membership interests—would sublease the storage and terminal facilities to SCT. *Id.* ¶ 43.

To facilitate the transaction, JP Energy was to prepay ABRH $125 million representing SCT's base rent for the storage and terminal facilities. *Id.* ¶ 44. ABRH would then use these funds "to pay various closing costs and expenses in order to acquire [Hovensa's] membership interests and thereby acquire the Refinery Facility." *Id.* Defendants also committed up to $65 million to fund ABR's overhead and other post-closing costs. *Id.* ¶ 45. In total, Defendants committed $190 million to this project. *Id.*

---

[3]   In the Amended Complaint, Plaintiff generally refers to JP Energy without differentiating between JP Energy and JP Energy St. Croix—although it is clear from the Letter Agreement that it was signed by JP Energy St. Croix. In its Response, Plaintiff describes JP Energy St. Croix as a "special purpose entity . . . created for the [Letter Agreement]." (Dkt. No. 30 at 26). Defendants, in their Motion to Dismiss, describe Defendants as affiliates of JP Energy St. Croix. (Dkt. No. 19 at 25). JP Energy St. Croix is not a party to this action.

The Letter Agreement contains several provisions which are relevant to the issues presented. Paragraph 9, titled "Governing Law; Choice of Forum," provides as follows:

> This Agreement is governed by, and will be construed in accordance with, the laws of the State of Texas, without regard to any conflict of law provisions. Each party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against any other party in any way arising from or relating to this Agreement and all contemplated transactions, including, but not limited to, contract, equity, tort, fraud and statutory claims, in any forum other than the U.S. District Court for the Northern District of Texas or the courts of the State of Texas, and any appellate court from any thereof. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in the U.S. District Court for the Northern District of Texas or the courts of the State of Texas. Each party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(Letter Agreement ¶ 9). Meanwhile, Paragraph 10, titled "Conditions Precedent," provides:

> The parties hereto agree that the following shall be conditions precedent to the terms contained herein (other than paragraph 11, Confidentiality) becoming binding obligations of the parties:
>
> (a)      The Senate of the U.S. Virgin Islands ratifies that certain Operating Agreement entered into by and among the Government of the U.S. Virgin Islands, Holdings[4] and Atlantic Basin Refining, Inc., with Hovensa, LLC to join in and consent to the Operating Agreement, dated as of October 29, 2014 (the "Operating Agreement");
>
> (b)      Holdings forms SCT and the parties finalize and execute the Sublease for the Terminal Assets in form and substance satisfactory to both parties prior to the closing on the purchase of the membership interests of Hovensa, LLC, with the funding of the Base Rent to be paid at time of said closing; and
>
> (c)      Holdings closes on the purchase of the membership interests of Hovensa, LLC pursuant to that certain Purchase and Sale Agreement entered into by and among Holdings, Atlantic Basin Refining, Inc.,

---

[4] In the Letter Agreement, "ABRH" is referred to as "Holdings."

Hovensa, LLC, Hovensa Holdings L.L.C. and Hess Oil Virgin Islands Corp., in the form agreed upon by said parties on December 11, 2014 (the "Purchase and Sale Agreement") within thirty (30) days of ratification of the Operating Agreement by the Senate of the U.S. Virgin Islands;

(d)    Holdings and JPE[5] negotiate and execute a limited liability company agreement of SCT in form and substance satisfactory to both parties, that sets forth the governance and other terms relating to the parties' joint ownership of SCT; and

(e)    The satisfactory completion by JPE of business, safety, tax, environmental, accounting legal and other due diligence. The management team and investment committee of JPE's owner have reviewed this Agreement and are supportive of the Transaction. Final approval by such investment committee, which can be obtained within the proposed diligence period, is required prior to the execution of definitive documentation.

(Letter Agreement ¶ 10).

Defendants' funding commitment and support for the partnership structure was set out in a letter dated May 18, 2015, that was sent to the company marketing Hovensa's assets. *Id*. ¶ 46. Based on Defendants' representations, ABR used this letter "to demonstrate to Hovensa that [ABR] had the ability to close on the Purchase and Sale Agreement." *Id*. Then, according to Plaintiff, during June and July 2015, negotiations over the terms of the partnership became fraught with uncertainty as Defendants "unilaterally" attempted to "change the structure of the transaction from a long-term lease of the terminal facility to SCT to a transaction whereby the title to the terminal facility would be transferred to JP Energy." *Id*. ¶¶ 47-53. Plaintiff rejected this change in the partnership because it eliminated its interest in the storage and terminal facilities. *Id*. ¶¶ 47-48. Plaintiff alleges that, "Defendants pursued this tactic knowing that if they withdrew their financial support at that late stage, it would be highly unlikely that ABR would secure another financial

---

[5]  In the Letter Agreement, JPE refers to JP Energy St. Croix, LLC.

partner in time to close on the Purchase and Sale Agreement [with Hovensa], and that ABR would lose the opportunity to acquire the Refinery Facility." *Id.* ¶ 52.

Without Plaintiff's knowledge or participation, Defendants entered into separate negotiations with Hovensa to purchase—through an ArcLight subsidiary—Hovensa's storage and terminal facilities. *Id.* ¶ 54. On September 15, 2015, Hovensa filed for bankruptcy and an auction was held to sell its assets on November 10, 2015. (Sale Order at 2). ABR did not participate in Hovensa's bankruptcy auction. (*See* Sale Order at 2-4, 7-8).

Limetree Bay Holdings, LLC ("Limetree"), ArcLight's subsidiary, ultimately purchased the storage and terminal assets during Hovensa's bankruptcy auction, for $190 million—the same amount that Defendants had initially committed to the aborted transaction with Plaintiff. *Id.* ¶¶ 54-55. [6] A Bankruptcy Sale Order was entered on December 1, 2015, Paragraph 10 of which reads as follows:

> Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all Persons and entities holding Interests (other than the Permitted Liens and Assumed Liabilities) are hereby forever barred, estopped and permanently enjoined from asserting their respective Interests against the Buyer, any of its Affiliates and Subsidiaries, and any of their respective Representatives, and each of their respective property and assets, including, without limitation, the Purchased Assets.

(Sale Order ¶ 10). The Sale Order defines "Interests" as including:

> [A]ll of the following, in each case to the extent against or with respect to the Debtor or in, on, or against or with respect to any of the Purchased Assets . . . claims (as defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, Liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or

---

[6] On September 4, 2015—prior to the bankruptcy auction—Limetree executed a stalking horse agreement with Hovensa, whereby it agreed to buy the terminal assets for a total purchase price of $190 million, subject to higher or better bids at the auction. (First Day Motion ¶¶ 17, 21; *see also* Dkt. No. 14 ¶ 55).

> nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, whether imposed by agreement, understanding, Law, equity or otherwise[.]

*Id*. ¶ V.

Plaintiff alleges that, from the outset, Defendants acted "under false pretenses" by entering into negotiations—not with the intention of actually forming a partnership with ABR—but "with the purpose and intent to convert ABR's activities and efforts . . . to gain access to [Hovensa] and the Refinery Facility, to co-opt for their own purpose the good will and preferred negotiating position enjoyed by ABR (while excluding ABR from the transaction), and ultimately to execute an [agreement] to acquire the terminal facility only." (Dkt. No. 14 ¶ 58). In doing so, Plaintiff claims that Defendants breached the parties' NDA by "improperly us[ing]" Confidential Information provided by Plaintiff, including its "plans, strategies, projections, engineering information, and financial models," to purloin ABR's business opportunity with Hovensa for itself. *Id*. ¶¶ 58-60. In addition to Confidential Information, Plaintiff alleges that Defendants also benefitted from Plaintiff's "position in the transaction . . . contacts with Hovensa and the government, prior negotiations with the EPA, prior negotiated documents with Hovensa and the [G]overnment of the Virgin Islands, and knowledge and diligence regarding the Refinery Facility." *Id*. ¶ 59. Plaintiff further alleges that, as a result, Defendants' actions "divert[ed] the transaction to ArcLight" and "deprived ABR of the substantial profit it expected to obtain from reconfiguration, restart, and operation of the refinery," and also robbed ABR of its 50% share in SCT—whose storage and terminal business would have generated millions of dollars per year in profit. *Id*. ¶¶ 60-61.

Plaintiff ABR commenced suit against Defendants in this Court on November 16, 2015 (Dkt. No. 1), and filed an Amended Complaint on January 22, 2016 (Dkt. No. 14). Plaintiff alleges several causes of action: Tortious Interference with Existing and Prospective Business Relationships (Count I); Breach of Contract (Count II); Breach of Contract (Injunction) (Count III); Misappropriation (Count IV); Unjust Enrichment (Count V); *Quantum Meruit* (Count VI); and Breach of Fiduciary Duty (Count VII). (Dkt. No. 14 ¶¶ 63-107).

Defendant filed the instant Motion to Dismiss or Transfer (Dkt. No. 19), seeking dismissal of the Amended Complaint or, in the alternative, transfer of the case to the District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1404. (Dkt. No. 19 at 13-18). Defendants' primary argument for both the dismissal and transfer is that ABR brought this action in the wrong forum in violation of the Letter Agreement's forum selection clause. (Letter Agreement ¶ 9). Alternatively, Defendants argue that dismissal of Plaintiff's claims is warranted on two grounds: 1) Plaintiff's claims are extinguished by the Bankruptcy Court's Sale Order as "interests" connected to, or arising from, Hovensa's purchased assets; and 2) Plaintiff otherwise fails to state claims sufficient to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 19 at 18-44). Plaintiff opposed Defendants' Motion (Dkt. No. 30), and Defendants filed a Reply (Dkt. No. 34).

## II.     FORUM SELECTION

Defendants seek dismissal of Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) or, alternatively, to transfer the case to the U.S. District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). (Dkt. No. 19 at 13-18; Dkt. No. 34 at 3-8). Defendants' Motion to Dismiss or Transfer is based on the forum selection clause contained in the Letter Agreement. *Id*. Defendants argue that Paragraph 10 of the Letter Agreement requires the parties

to construe the Agreement in accordance with the laws of the state of Texas and to litigate any claims "arising from or relating to" the "contemplated transactions" in the Letter Agreement only in Texas. (Letter Agreement ¶ 9; Dkt. No. 34 at 3).[7] Plaintiff counters that the forum selection clause was not triggered because the Letter Agreement was subject to several conditions precedent—which were not met—before the contract as a whole became binding upon the parties. (Dkt. No. 30 at 6-8).

Because the Court finds that the forum selection clause in the Letter Agreement was not triggered under the circumstances here, and that transfer pursuant to 28 U.S.C. § 1404(a) is also unavailing, Defendants' Motion to Dismiss or Transfer based on the forum selection clause will be denied.

## A.    Applicable Legal Principles

The Third Circuit recognizes two avenues for challenging a plaintiff's choice of forum based on the applicability of a forum selection clause. One avenue is to file a motion to dismiss under Rule 12(b)(6). *Salovaara v. Jackson Nat'l Life Ins. Co.*, 246 F.3d 289, 298 (3d Cir. 2001). Alternatively, a motion to transfer venue may be filed pursuant to 28 U.S.C. § 1404. *Id.* at 297-98. Neither avenue provides the relief that Defendants seek here.

In view of Defendants' reliance on the forum selection clause in the Letter Agreement, the Court must first determine whether the clause applies, and thus will turn to an interpretation of the language of the Agreement. In that regard, the Court will apply Virgin Islands contract law in this

---

[7] While Defendants ArcLight and JP Energy were not signatories to the Letter Agreement, Defendants contend that the forum selection clause applies to them even as non-signatories because they are affiliates of one of the signatories, JP Energy St. Croix. (Dkt. No. 19 at 15-16; Dkt. No. 34 at 7-8). Plaintiff argues to the contrary. (Dkt. No. 30 at 15-16). The Court need not address this issue in light of its ultimate ruling that the forum selection clause does not apply here.

diversity action because contract interpretation is "quintessentially [a] substantive [issue], rather than [a] procedural [one]." *Collins on behalf of herself v. Mary Kay, Inc.*, 874 F.3d 176, 181 (3d Cir. 2017) (a federal court with diversity jurisdiction must apply state law to substantive issues and federal law to procedural issues) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).[8]

Generally, in applying principles of contract interpretation, a court must first determine whether the provision's language states the parties' intentions clearly and unambiguously. *Citibank, N.A. v. Chammah*, 2001 WL 1568553, at *5 (Terr. V.I. Oct. 2, 2001); *see also Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent."). To be unambiguous, a contract clause must be reasonably capable of only one meaning. *Walker v. Virgin Islands Waste Mgmt. Auth.*, 2015 WL 404007, at *4 n.6 (V.I. Super. Jan. 26, 2015) (finding a contract clause unambiguous because there was "only one way to interpret" it); *Addie v. Kjaer*, 2009 WL 482497, at *5 (D.V.I. Feb. 23, 2009) ("To be unambiguous, an agreement must be reasonably capable of only one construction.") (quoting *Washington Hosp. v. White,* 889 F.2d 1294, 1301 (3d Cir.1989)); *Virgin Islands Mar. Serv., Inc. v. Puerto Rico Mar. Shipping Auth.*, 978 F. Supp. 637, 647 (D.V.I. 1997), *aff'd*, 162 F.3d 1153 (3d Cir. 1998) (finding a contract unambiguous because when each word of the contract is "given its natural meaning without any need for interpretation, implication or importation," there was "only [one] legally acceptable construction"); *see also Evergreen Nat. Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex.

---

[8] The Court notes, as reflected in the discussion that follows, that the application of Texas contract law would not change the analysis or outcome. Defendants appear to agree that Texas law and Virgin Islands law on the relevant points are not materially different. (Dkt. No. 19 at 12) ("[T]he points of law relevant to this motion do not differ substantially between Texas and the law of the Virgin Islands and other Third Circuit authority, rendering an extensive choice of law analysis unnecessary.").

App. 2003) ("If a [contract] can be given only one reasonable meaning, it is not ambiguous and will be enforced as written.") (citing *State Farm Fire & Cas. Co. v. Vaughan,* 968 S.W.2d 931, 933 (Tex.1998)); *Universal C. I. T. Credit Corp. v. Daniel*, 150 Tex. 513, 517 (1951) ("if after applying established rules of interpretation to the contract . . . [and] if only one reasonable meaning clearly emerges [the contract] is not ambiguous."). "[W]here the language of a contract is clear and unambiguous, the parties' intent must be derived from the plain meaning of its terms." *Davies v. Certain Underwriters at Lloyds of London*, 2017 WL 3759810, at *6 (V.I. Super. Aug. 25, 2017) (internal citation and quotation marks omitted); *see also Heritage Res., Inc.*, *v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) ("In construing an unambiguous [contract] . . . [w]e presume that the parties to a contract intend every clause to have some effect  . . . [w]e give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense.").

Further, "[t]he meaning of a condition precedent in the context of a contract is an event which must occur before performance under a contract becomes due." *Isaac v. Guardian Ins. Co.*, 2016 WL 6024475, at *5 (V.I. Super. Oct. 12, 2016) (internal quotation marks and ellipses omitted); *United Corp. v. Reed, Wible & Brown, Inc.*, 626 F. Supp. 1255, 1258 (D.V.I. 1986) (defining condition precedent in a contract as "an event which must occur before there is a right to performance and a resulting breach of duty"); *see also Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.") (internal citation and quotation marks omitted).

## B.    Analysis

The Letter Agreement contains a forum selection clause in Paragraph 9, which calls for "any action . . . arising from or relating to this Agreement and all contemplated transactions" to be brought in the federal or local courts in Texas. (Letter Agreement ¶ 9). In the very next paragraph, however, the Letter Agreement provides that: "The parties hereto agree that *the following shall be conditions precedent to the terms contained herein (other than paragraph 11, Confidentiality) becoming binding obligations of the parties*." *Id*. ¶ 10 (emphasis added). The paragraph then continues with a list of the conditions precedent, including: obtaining Senate ratification of the Operating Agreement; forming SCT and executing the sublease of the terminal; closing on the purchase of Hovensa's membership interests; and completing various aspects of due diligence by JP Energy St. Croix. *Id*.

The Court finds that the plain language of the Letter Agreement in Paragraph 10 as it pertains to the conditions precedent is capable of only one meaning. *Walker*, 2015 WL 404007 at *4 n.6; *Evergreen*, 111 S.W.3d at 676. Paragraph 10 is entitled "Conditions Precedent," and it states explicitly and unequivocally that there were certain conditions precedent before the Letter Agreement as a whole—including the forum selection clause—became binding on the parties. In other words, the "binding obligations of the parties" in the Letter Agreement were "condition[ed]" upon the satisfaction of several conditions precedent, which were listed by the parties therein. *See* Letter Agreement ¶ 10. The Court finds that the only reasonable construction of Paragraph 10 is that before any of the provisions of the Letter Agreement could be binding on the parties (with only one exception), the conditions precedent must first be satisfied. *See Davies*, 2017 WL 3759810 at *6 (finding that in unambiguous contracts, the "parties' intent must be derived from the plain meaning of its terms") (internal citation and quotation marks omitted); *Pac. Emp'rs. Ins.*

*Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) ("If we determine that the language is unambiguous, we follow its plain meaning"); *Heritage*, 939 S.W.2d at 121.[9]

Buttressing this finding is the fact that Paragraph 10 is specific in identifying the *only* provision in the Letter Agreement that was *not* subject to the conditions precedent, i.e. Paragraph 11, which pertains to confidentiality. This single exception illustrates that the parties to the Letter Agreement were quite capable of exempting the "Governing Law; Choice of Forum" provision from the "Conditions Precedent" precondition if they so desired. They chose not to do so. "Because the law does not assume that the language of the contract was chosen carelessly, that language is of paramount importance." *Pac. Emp'rs.*, 693 F.3d at 426 (internal citation and quotation marks omitted). The Court will not write language into the Letter Agreement that does not exist nor interpret the Agreement in a manner that is inconsistent with its plain meaning.

In light of the finding that the Letter Agreement here contains plain, unambiguous language which confirms that the "Conditions Precedent" set out in Paragraph 10 were terms that had to be fulfilled before other terms contained in the Letter Agreement (with the exception of Paragraph 11) became binding obligations of the parties, and because it is undisputed that the conditions precedent in Paragraph 10 were not satisfied (Dkt. No. 19 at 6-9; Dkt. No. 30 at 6-8), the forum

---

[9] Citing one case, Defendants assert that "[c]ourts routinely reject" arguments that forum selection clauses should be ignored based on unfulfilled conditions precedent, thus preventing parties with buyer's remorse from being able to invalidate the clauses by asserting that unfulfilled conditions render the contract void. (Dkt. No. 34 at 3-4). Defendants subsequently note that "it was Plaintiff who failed to satisfy the March Letter's conditions precedent. A party cannot use its own failure to perform to avoid its contract." *Id.* at 5 n.4 (citations omitted). According to Plaintiff's allegations, however, there was no buyer's remorse on Plaintiff's part that resulted in the unfulfilled conditions precedent, but rather calculated bad faith conduct by Defendants in the withdrawal of their financial commitment with Plaintiff that precipitated what Defendants knew would be Plaintiff's inability to proceed with the Hovensa transaction. (Dkt. No. 14 ¶¶ 66-67). In any event, as discussed below, there is certainly support for honoring clear and unambiguous conditions precedent language even when a forum selection clause is at issue.

selection clause in Paragraph 9 was not triggered. Therefore, Plaintiff was not required to file this lawsuit in the federal or local courts in Texas. *Knopick v. UBS Fin. Servs., Inc.*, 2015 WL 1650070, at *4 (E.D. Pa. Apr. 14, 2015) (holding that because "the language preceding the forum selection clause describes a condition precedent to its applicability . . . the non-occurrence of this condition precedent renders the forum selection clause inapplicable"); *Visalus Inc. v. Bohn*, 2013 WL 1759420, at *3 (E.D. Mich. Apr. 24, 2013) (finding that the forum selection clause in the Agreement is not binding because the condition precedent to the enforceability of the Agreement did not occur); *see OHM Hotel Grp., LLC v. Dewberry Consultants, LLC*, 2016 WL 427959, at *8 (E.D. Mo. Feb. 4, 2016) ("Conditions precedent [to an applicability of a forum selection clause] . . . are construed as such only if unambiguous language so requires."); *Vogt-Nem, Inc. v. M/V Tramper*, 263 F. Supp. 2d 1226, 1232 (N.D. Cal. 2002) ("The court will not construe contract terms as conditions [to an applicability of a forum selection clause] unless required to do so by 'plain, unambiguous language.'") (internal citation omitted); *see also Cajun Constructors, Inc. v. Velasco Drainage Dist.*, 380 S.W.3d 819, 826 (Tex. App. 2012) ("Courts will not construe a contract provision as a condition precedent unless compelled to do so by language that may be construed no other way.").[10] Accordingly, Defendants' Rule 12(b)(6) Motion to Dismiss based on the forum selection clause will be denied.[11]

---

[10] Because the Court has found as a threshold matter that the forum selection clause in the Letter Agreement was not triggered, the Court need not address the parties' arguments as to whether the allegations in the Amended Complaint fall within the scope of that clause, so as to render it applicable to this matter. (See Dkt. No. 19 at 14; Dkt. No. 30 at 9-11).

[11] In its Reply, Defendants rely on *Grand Cent. Sanitary Landfill, Inc. v. C-E Huntington Ltd. P'ship*, 1995 WL 92377 (E.D. Pa. Mar. 1, 1995), to argue that a forum selection clause should not be invalidated "based upon a failure to fulfill conditions precedent because such a ruling would contravene the parties' agreement that all disputes arising out of the contract, including its validity and enforceability, must be litigated in the specified forum." (Dkt. No. 34 at 4-5). But the Court finds the circumstances in *Grand Cent.,* distinguishable from those presented here. The issue in

Title 28 U.S.C. § 1404(a) is equally unavailing. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Usually, "because the overarching consideration under § 1404(a) is whether a transfer would promote the interest of justice, a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (internal citation and quotations omitted). However, as discussed above, the Court finds that the forum selection clause was not triggered under the circumstances here, thus rendering it inapplicable to support a transfer.

Beyond their reliance on the Letter Agreement's forum selection clause, Defendants did not argue Section 1404(a)'s other factors concerning the convenience of the parties and witnesses and the interest of justice, thereby providing no other support for a transfer request.[12] *Beberman v. U.S. Dep't of State*, 2016 WL 3014665, at *3 (D.V.I. May 24, 2016) ("[t]he burden is on the moving party to establish that a balancing of proper interests weigh[s] in favor of the transfer . . . [and] unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail") (internal citation and quotation marks omitted).

---

*Grand Cent.*, centered around whether "the contract as a whole [was] valid and enforceable." 1995 WL 92377 at *2. The court found that the defendant, "under the guise of challenging only the enforceability of the forum selection clause," was actually "truly seeking an adjudication from th[e] [c]ourt on th[is] ultimate issue." *Id.* However, in this case, there is no issue that has been advanced regarding the validity of the Letter Agreement, and there is no dispute that the conditions precedent have not been fulfilled. The only issue here is one of contract interpretation, i.e., whether the forum selection clause was triggered in light of the terms of the conditions precedent provision.

[12]  Defendants state only that parties and third parties "are scattered among Texas, the Virgin Islands, and Massachusetts," (Dkt. No. 19 at 17), thus giving "no other forum [] a superior claim [in light of] the controlling authority of the forum selection clause." *Id.*

On the other hand, Plaintiff's choice of forum in this District is entitled to deference. "[A] plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice should not be lightly disturbed." *Beberman*, 2016 WL 3014665 at *3 (quoting *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970))*; see also Wm. H. McGee & Co. v. United Arab Shipping Co.*, 6 F. Supp. 2d 283, 289 (D.N.J. 1997) ("a plaintiff's choice . . . is entitled to greater deference [especially] when a plaintiff chooses its home forum") (internal citation and quotation marks omitted). "In deciding transfers under § 1404(a), courts, therefore, generally assign the plaintiff's choice of forum significant weight." *Job Haines Home for the Aged v. Young*, 936 F. Supp. 223, 227 (D.N.J. 1996).

Here, the Plaintiff is a Virgin Islands corporation with its principal place of business in St. Croix, where the Hovensa facility is located and where Plaintiff asserts that "numerous witnesses" are present. (Dkt. No. 14 ¶ 1; Dkt. No. 30 at 16). Because "[a] plaintiff's choice of forum is considered to be presumptively correct," *Wm. H. McGee*, 6 F. Supp. 2d at 290, the Court will not disturb Plaintiff's choice of forum here. Accordingly, Defendant's Motion to Transfer pursuant to 28 U.S.C. §1404 will be denied.

### III. BANKRUPTCY SALE ORDER

Having determined that the forum selection clause was not triggered, and that a transfer of this action from this jurisdiction is not otherwise warranted, the Court next considers whether the Bankruptcy Court's Sale Order ("Sale Order") bars any or all of Plaintiff's claims.

Defendants argue that, as affiliates of Limetree (the successful bidder in the bankruptcy auction), the Sale Order expressly relieves them of liability for any claims related to the purchased Hovensa assets. (Dkt. No. 19 at 18-23; Dkt. No. 34 at 8-14). Thus, Plaintiff's lawsuit is an impermissible collateral attack on the Sale Order. *Id.*

Plaintiff, on the other hand, argues that its claims relate not to the purchased assets but to Defendants' conduct, which occurred prior to, and separate from, the bankruptcy proceedings, and should thus remain unaffected by the Sale Order. (Dkt. No. 30 at 16-25). In further support, Plaintiff argues that it does not seek to undo the bankruptcy sale, challenge the outcome of the sale, or pursue successor liability against the buyer. *Id*. Thus, its claims against Defendants should not be viewed as a collateral attack on the Sale Order. *See id*.

The Court finds that some of Plaintiff's claims—specifically, Counts I, V, and VII—are indeed "interests" that are "connected to or arise from" the purchased Hovensa assets, and therefore represent an impermissible collateral attack on the Sale Order. Accordingly, Counts I, V, and VII will be dismissed with prejudice. However, Counts II, III, IV, and VI are not "interests," and thus are not barred by the Sale Order.

### A. Applicable Legal Principles

Section 363 of the Bankruptcy Code permits a debtor or trustee to sell assets "free and clear of any interest in such property." 11 U.S.C. § 363(f). Section 363(f) states, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*Id.* The "free and clear" provision of § 363(f) serves two important policy considerations: to foster finality in bankruptcy sales and to maximize the value of the debtor's assets which are subject to the sale. *In re NE Opco, Inc.*, 513 B.R. 871, 877 (Bankr. D. Del. 2014).

While the Bankruptcy Code does not define the term "any interest" as used in § 363(f), the Third Circuit, along with other courts, has established that "the trend seems to be towards a broader interpretation which includes other obligations that may flow from ownership of the property." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 258 (3d Cir. 2000); *In re Christ Hosp.*, 2014 WL 4613316, at *11 (D.N.J. Sept. 12, 2014) ("[C]ourts have recognized the broadening trend in defining the scope of sale-affected interests in property"); *In re Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) ("[T]he term 'interest' is a broad term no doubt selected by Congress to avoid 'rigid and technical definitions drawn from other areas of law[.]'") (quoting *Russello v. United States*, 464 U.S. 16, 21 (1983)). "[A]ny interest is therefore intended to refer to obligations that are *connected to, or arise from,* the property being sold," *Folger Adam*, 209 F.3d at 259 (3d Cir. 2000) (internal citation omitted), or obligations "that could 'potentially travel with the property being sold.'" *In re La Paloma Generating, Co.*, 2017 WL 5197116, at *4 (Bankr. D. Del. Nov. 9, 2017) (internal citation and quotations omitted); *see also In re Trans World Airlines, Inc.,* 322 F.3d 283, 290 (3d Cir. 2003) (finding that while "the interests of the EEOC and the [travel voucher holders] in the assets of TWA's bankruptcy estate are not interests in property in the sense that they are not *in rem* interests, . . . they are interests in property within the meaning of section 363(f) in the sense that *they arise from* the property being sold") (emphasis added).[13]

_____

[13] *See also Myers v. United States*, 297 B.R. 774, 781-82 (S.D. Cal. 2003) (finding that Plaintiff's claim for personal injury are 'interests' in property within the meaning of § 363(f) in the sense that they arise from the property being sold, i.e. the contracts to transport toxic materials); *In re Leckie*

Determining what constitutes "interest" under § 363(f) requires a case-by-case analysis. *In re Christ Hosp.*, 502 B.R. 158, 171 (Bankr. D.N.J. 2013), *aff'd,* 2014 WL 4613316 (D.N.J. Sept. 12, 2014). "The overarching factor in evaluating [a plaintiff's] claims as § 363(f) 'interests' is the undeniable linkage" to the property being sold in the bankruptcy proceeding. *Id*. at 172. If the claims fall within the category of interests under § 363(f), the property is subject to a sale "free and clear" of the interests. *Id*. at 185.

Bankruptcy sale orders pursuant to § 363's "free and clear" provisions are immune from collateral attack through litigation elsewhere. *See id; see also Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (U.S. 1995) (a collateral attack on a bankruptcy injunction, "cannot be permitted . . . without seriously undercutting the orderly process of the law"); *Douglas v. Stamco*, 363 F. App'x 100, 102-03 (2d Cir. 2010) ("the potential chilling effect of allowing a tort claim subsequent to the [bankruptcy] sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors").

Further, if adequate notice was given, a party's "failure to object to a § 363 sale has been found to constitute consent per § 363(f)(2) to a 'free and clear' sale of the nonobjector's interests in property being sold." *In re Christ Hosp.*, 502 B.R. at 174. Accordingly, "such consent-based bankruptcy sale orders . . . are not subject to collateral attacks." *Id*. at 175.

---

*Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996) (holding that coal miners' retirement funds and plan's "rights to collect premium payments from Appellees constitute [§ 363(f)] interests in the assets that [they] now wish to sell, or have sold already"); *In re WBQ Partnership,* 189 B.R. 97, 105 (Bankr. E.D.Va.1995) (Virginia's right to recover depreciation overpayment upon sale of debtor's assets was an "interest" within the meaning of section 363(f)); *In re All American of Ashburn, Inc.,* 56 B.R. 186, 190 (Bankr. N.D. Ga.1986) (sale pursuant to § 363(f) precluded mobile home owners from prosecuting product liability action against purchaser of debtor's assets).

### B.      Analysis

#### 1.      Parties' Arguments

Defendants argue that Plaintiff's claims are § 363(f) "interests" that are "connected to" or "arise from" the purchased Hovensa assets. (Dkt. No. 19 at 19-20). Thus, the Sale Order bars Plaintiff from asserting these "interests" against Defendants because they are affiliates of Limetree—the successful purchaser at auction. (*Id.;* Dkt. No. 34 at 9-10).

According to Defendants, Plaintiffs' allegations are "obviously intertwined" with the purchased assets in several ways. (Dkt. No. 19 at 21). First, Plaintiff alleges that ArcLight "misappropriat[ed] the business opportunity" created by ABR by creating Limetree to become the bankruptcy stalking horse bidder. *Id*. Second, Plaintiff asserts that Defendants' structure of the transaction and the bankruptcy sale itself resulted in damaging ABR by "making it highly unlikely if not impossible for ABR to be able to secure the project financing needed to reconfigure, restart and operate the Refinery Facility." *Id*. Third, Plaintiff's claim that Defendants breached the NDA and misappropriated trade secrets is premised on Limetree's alleged use of ABR's Confidential Information to purchase Hovensa's storage facilities. (Dkt. No. 34 at 10). Because the Sale Order therefore extinguished Plaintiff's claims, Defendants maintain that Plaintiff's lawsuit is an improper collateral attack on the Sale Order and should be dismissed. (Dkt. No. 19 at 18-23).

Alternatively, Defendants argue that Plaintiff effectively "consented" to the release of its claims because Plaintiff did nothing to object to the sale of Hovensa's assets during the bankruptcy proceeding. (Dkt. No. 19 at 22; Dkt. No. 34 at 12-13). According to Defendants, despite being aware of the bankruptcy auction and monitoring the bankruptcy case, Plaintiff "did not assert its rights or object to that sale process (let alone make a competing bid or ask for more time to arrange financing)[,] . . . ABR did not assert its supposed right to participate in the bid with Limetree [],

or to protect its [Confidential Information] (which it now claims was improperly used during the proceedings)." (Dkt. No. 19 at 22). Defendants claim such inaction is "fatal to [Plaintiff's] case." (Dkt. No. 34 at 12).

In opposition, Plaintiff argues that the Bankruptcy Court's Sale Order does not insulate Defendants from their tortious conduct and breach of the NDA. (Dkt. No. 30 at 16-25). According to Plaintiff, the Sale Order does not bar the claims against Defendants because the claims are not "interests" under § 363(f) that "flow from" the purchased assets. *Id*. at 17-19. Plaintiff argues that the bankruptcy proceedings involved only Hovensa and Limetree—neither of which are parties to this case or signatories to the NDA. *Id*. at 17-18; 22-23. Plaintiff further argues that it does not seek to challenge the bankruptcy proceedings or assert claims against the purchased assets. *Id*. at 17-19. Instead, Plaintiff insists that this lawsuit arises from Defendants' breach of the NDA and their conduct to undermine Plaintiff *prior* to the bankruptcy proceedings. *Id*. Plaintiff contends that, "[t]he liability in this case is based upon Defendants having orchestrated a series of actions designed to frustrate ABR's acquisition [of Hovensa] while working under the guise of being ABR's partners and using ABR's Confidential Information in breach of the NDA." *Id*. at 18. According to Plaintiff, this "outrageous and inexcusable conduct . . . taken and completed before the bankruptcy filing" are "independent" of Hovensa's bankruptcy sale of the storage and terminal facilities or the purchase of those assets by Limetree. *Id*.

The scope of the Sale Order, and hence the effect of that Order on Plaintiff's claims, turns on whether those claims are in fact § 363(f) "interests" that are "connected to, or arise from," the purchased assets. *Folger Adam*, 209 F.3d at 259. In contemplating such a determination, it is helpful for the Court's analysis to first set forth Plaintiff's claims, which are seven-fold:

- **Count I (Tortious Interference with Existing and Prospective Business Relationships)**: Plaintiff alleges that Defendants "wrongfully interfered" with Plaintiff's

attempted acquisition of Hovensa by initially agreeing to act as ABR's financial partner and then strategically pulling out funding at a critical juncture of ABR's negotiations with Hovensa. As a result, ABR was deprived of its expected earnings as the full owner of all of Hovensa's assets and sole operator of the refinery, as well as its 50% interest as an operator of the terminal facility. Plaintiff alleges that Defendants knew of ABR's expectations and in fact were privy to ABR's financial projections. (Dkt. No. 14 ¶¶ 63-69).

- **Count II (Breach of Contract)**: Plaintiff alleges that Defendants misused the Confidential Information that ABR developed and subsequently provided to Defendants in their dealings with Hovensa, in violation of the parties' NDA. Plaintiff further alleges that Defendants continued to use this Confidential Information even after completing the purchase of Hovensa's terminal facility. *Id.* ¶¶ 70-76.

- **Count III (Breach of Contract (Injunction))**: Plaintiff alleges that the parties' NDA authorizes either party to obtain an injunction to prevent the misuse of Confidential Information. Plaintiff requests that an injunction be entered against Defendants to prevent their, and their subsidiaries', unauthorized use of Confidential Information. *Id.* ¶¶ 77-82.

- **Count IV (Misappropriation)**: Plaintiff alleges that Defendants are using Confidential Information gained from ABR in their dealings with Hovensa and in their future plans for the terminal facility. *Id.* ¶¶ 83-91. Defendants obtained the Confidential Information "for use in acting as ABR's partners" and "with the express understanding that the material would be confidential." *Id.* ¶¶ 84-85. However, the information has been used by Defendants "to pursue the [Hovensa] transaction without ABR." *Id.* ¶ 90.

- **Count V (Unjust Enrichment)**: Plaintiff alleges that because ABR had an expectation of benefitting from the purchase and operation of the Hovensa terminal and refinery, Defendants' self-dealing in purchasing outright Hovensa's storage and terminal assets for itself deprived ABR of these earnings and enriched themselves by taking what would have been ABR's share of the storage and terminal business. Moreover, Plaintiff alleges that Defendants knew of ABR's expectation and in fact were privy to ABR's operational plans and financial projections. *Id.* ¶¶ 92-96.

- **Count VI (*Quantum Meruit*)**: Plaintiff alleges that since it was ABR which "introduced" Defendants to the Hovensa transaction and provided them with the necessary information, which the latter in turn improperly used for their own benefit, "[i]t would be inequitable for Defendants to retain the benefits of ABR's work, prior negotiations, contacts, and business, engineering and operational plans without payment of value to ABR." *Id.* ¶¶ 97-101.

- **Count VII (Breach of Fiduciary Duty)**: Plaintiff alleges that because Defendants were ABR's financial and operational partner in a joint venture to operate the terminal facility, Defendants owed ABR a fiduciary duty, which they breached when they "took actions to undermine ABR's" transaction with Hovensa and acquire for an ArcLight subsidiary ABR's share of the terminal facility. *Id.* ¶¶ 102-107.

## 2. Counts I, V, and VII: Tortious Interference with Existing and Prospective Business Relationship, Unjust Enrichment, and Breach of Fiduciary Duty

The Court finds that Counts I, V, and VII are "interests" that are "connected to, or arise from," the purchased Hovensa assets, i.e., the storage and terminal facility, and are thus subject to the Sale Order's injunction. The "clear factual connection" between these claims—which center on the deprivation of ABR's expected earnings from the Hovensa transaction—and the sale of Hovensa's storage and terminal facilities to Defendants' affiliate is evident. *See In re Christ Hosp.*, 502 B.R. at 181.

The Court finds that *In re Christ Hosp.*, is instructive under the circumstances here. 502 B.R. 158. In that case, two companies vied to acquire a debtor's assets in bankruptcy, with the loser (Prime) accusing the winner (Hudson) of tortious conduct prior to the bankruptcy proceedings which "unfairly and irreparably destroyed" Prime's acquisition efforts by making "the deal economically unfeasible, requiring Prime [] to withdraw its offer to purchase." *Id.* at 166. At the conclusion of an open bid auction, the bankruptcy court issued a sale order which transferred the debtor's assets to Hudson "free and clear" of claims, pursuant to § 363(f). *Id.* at 161. Thereafter, Prime filed a lawsuit in state court against Hudson. *Id.* at 161, 165. The suit alleged, *inter alia*, tortious interference in contractual relations as it related to Hudson's acquisition of the purchased assets. *Id.* at 161. Such tortious interference, according to Prime, resulted in deliberately driving the debtor into bankruptcy where Hudson was then able to purchase the assets at a significantly lower price than what Prime had negotiated with the debtor. *Id.* at 167.

In finding that Prime's economic tort claims were § 363(f) "interests," the bankruptcy court stated:

> [T]he overarching factor in evaluating Prime's economic tort claims as § 363(f) "interests" is the undeniable linkage—as Prime has claimed it—of Prime's asset

purchase agreement of December 2011 [and] its purported "loss" of the benefit of that agreement, the supposed "forcing" of the hospital into bankruptcy, and the sale of hospital assets at a diminished price to Hudson in a bankruptcy auction. *The culmination of this chain of events has been the transfer to and use of hospital assets by Hudson, very much in opposition to Prime's goal for the transfer and use of those same assets*. Thus, Prime's stated factual claims "are connected to, or arise from, the property being sold," consistent with Third Circuit precedent establishing the scope of § 363(f) interests.

*In re Christ Hosp.*, 502 B.R. at 172 (emphasis added). The bankruptcy court further noted: "[T]he transfer to and use by Hudson of hospital assets underpins Prime's economic tort allegations—that is, *Prime's claims arise out of Hudson's ultimate use of the hospital's assets*. As such, those claims are § 363(f) 'interests,'" which are barred from being asserted against Hudson by the bankruptcy court's sale order affirming the assets as "free and clear" for the purchaser. *Id*. at 173 n.15 (emphasis added). The bankruptcy court thus found that Prime's lawsuit—which sought damages from Hudson—was a "frontal attack on the economic integrity of the [bankruptcy] sale, and is thus no less a collateral attack than one which seeks to set aside that sale." *Id*. at 185.

Here, as in *In re Christ Hosp.*, Hovensa, the debtor, sold its storage and terminal assets in an open auction. Defendants' affiliate, Limetree, which had executed an Asset Purchase Agreement with Hovensa and negotiated with Hovensa to become its stalking horse bidder prior to the auction, ultimately was the successful purchaser of those assets. (Dkt. No. 14 ¶¶ 54-55). After the auction, the Bankruptcy Court here issued a Sale Order which defined "interests" as "claims . . . encumbrances, obligations, Liabilities, demands, [], actions, suits . . . contractual commitments . . . or interests of any kind or nature whatsoever," to the extent those interests are "against or with respect to the Debtor *or in, on, or against or with respect to any of the Purchased Assets*." Sale Order ¶ V (emphasis added).

As in *In re Christ Hosp.*, the "undeniable linkage" between Plaintiff's allegations in Counts I, V, and VII and the purchased Hovensa assets confirms that Plaintiff's claims—as alleged in

those Counts—are barred by § 363(f). *In re Christ Hosp.*, 502 B.R. at 172. In Count I, Plaintiff alleges that Defendants knew that ABR had an "*expectation of benefitting* from the purchase of the [Hovensa] terminal and refinery, a 50% ownership in the terminal and storage business, and the ownership and operation of the refinery." (Dkt. No. 14 ¶¶ 64-65) (emphasis added). Plaintiff further alleges that "Defendants *wrongfully interfered* by initially agreeing to act as ABR's financial partner and to operate the terminal facility, and then *pulling out at a moment strategically calculated to disrupt and terminate* ABR's transaction to acquire the HOVENSA site, which increased the likelihood that the Defendants could acquire the terminal portions, and eliminate ABR's 50 percent interest in SCT." *Id.* ¶ 66 (emphasis added). Plaintiff goes on to allege that "*due to Defendant's interference*," ABR was "*deprived* of its expected profit from the transaction and its ownership of the Refinery Facility, including a 50 percent interest in the terminal and storage business, and profits from the reconfiguration, restart and operation of the refinery, as well as its share of any eventual resale of the Refinery Facility." *Id.* ¶ 68 (emphasis added). According to Plaintiff, "ABR would have received these expected benefits *absent Defendants' acts*." *Id.* ¶ 64 (emphasis added).

Plaintiff's allegations in Count I thus portray a link between Defendants' actions—which form the basis of the claim—and Plaintiff's loss of its expected profits from owning and operating the Hovensa facilities. After agreeing to be ABR's partner, Defendants pulled out at a strategic moment allegedly designed to disrupt ABR's transaction to acquire the Hovensa assets. *Id.* ¶ 66. According to Plaintiff, Defendants' wrongful actions increased their chances of acquiring the property and robbed ABR of the profits it had expected to make from acquiring those same assets. *Id.* ¶¶ 67-68.

A similar sequence of events is depicted in Count V. In that Count, Plaintiff alleges that it

"had an *expectation of benefitting* from the purchase and operation of the HOVENSA terminal facility and the refinery." *Id*. ¶ 93 (emphasis added). Plaintiff further alleges that "*Defendants' self-dealing* deprived ABR of the benefits of these transactions causing it substantial damages, including loss of the profits ABR reasonably expected to realize as a 50% owner of SCT, the tenant under the lease of the terminal and storage facility." *Id*. ¶ 94 (emphasis added). Plaintiff went on to allege that Defendants "*enriched themselves by co-opting* the terminal and storage facility and *taking for themselves* Plaintiff's share of the terminal and storage business." *Id*. ¶ 95 (emphasis added). According to Plaintiff, ABR "would have received the[se] expected benefits *absent Defendants' acts*." *Id*. ¶ 93 (emphasis added).

The direct connection here between the claims in Count V and the purchased Hovensa assets is again apparent. The linkage here is grounded in Plaintiff's allegations that Defendants' self-dealing and self-enrichment—achieved "*by co-opting* the terminal and storage facility and *taking for themselves Plaintiff's share* of the terminal and storage business"—directly resulted in the loss of Plaintiff's share of the transaction, which deprived Plaintiff of the profits it had expected to garner from acquiring the Hovensa assets. (Dkt. No. 14 ¶¶ 94-96) (emphasis added).

In Count VII, Plaintiff alleges that ABR and Defendants "had expressed the intention to form, and *had established, a joint venture partnership* for acquisition and operation of the marine terminal and storage facilities." *Id*. ¶ 103 (emphasis added). Plaintiff further alleges that because "Defendants were ABR's financial and operational partner, and through JP Energy were its co-owner in SCT, [] they owed a fiduciary duty to ABR." *Id*. ¶ 104. According to Plaintiff, Defendants breached that duty when "they *took actions to undermine ABR's participation in the transaction* so as to gain full ownership and control for themselves through an ArcLight affiliate created for that purpose." *Id*. ¶ 104 (emphasis added). These actions, according to Plaintiff, included

"secur[ing] for ArcLight ABR's share of the marine terminal and storage business . . . and by strategically withdrawing ArcLight's financial commitment at a time that left, and which ArcLight knew would leave, ABR without the ability to secure another financial partner and proceed with the transaction, and *thereby eliminated [ABR]* . . . in order to make straight the path for the Defendants to acquire the marine terminal and storage business for its own account." *Id.* ¶ 106 (emphasis added).

Here again, there is a clear linkage between the claims in Count VII and the Hovensa assets. Plaintiff alleges that Defendants breached their fiduciary duty to ABR when they withdrew their financial commitment at a time that Defendants knew would leave ABR unable to proceed with the Hovensa transaction, thereby undermining ABR's position and ultimately eliminating ABR from the transaction. *Id.* ¶¶ 104-106. Defendants then created a new affiliate (Limetree) for the specific purpose of securing for themselves ABR's share of the storage and terminal business. *Id.* ¶ 104. In Plaintiff's own words, Defendants eliminated ABR from the transaction "in order to make straight the path for the Defendants to acquire the marine terminal and storage business for its own account." *Id.* ¶ 106. As in Counts I and V, Plaintiff alleges that Defendants' deliberate and successive acts directly resulted in Plaintiff's loss of the Hovensa assets and Defendants' acquisition of the same.

The Court finds that Counts I, V, and VII portray a "chain of events" which "culminat[ed]" in Defendants' affiliate (Limetree) possessing and using Hovensa's storage and terminal facilities without ABR—a development "very much in opposition to" ABR's goal "for the transfer and use of those same assets." *See In re Christ Hosp.*, 502 B.R. at 172. Indeed, Plaintiff admits as much, stating: "The liability in this case is based upon Defendants having orchestrated *a series of actions* designed to frustrate ABR's acquisition" of the Hovensa assets—actions which served to

"undermine" and eliminate[]" ABR from the transaction and "tak[e] for Defendants Plaintiff's share of the terminal and storage business." *Id.* ¶¶ 66, 95, 104, 106. This "series of actions" include: Defendants' agreement to act as ABR's partner; Defendants strategic withdrawal from their financial commitment at a time which left ABR vulnerable; and Defendants' acquisition for themselves—via a newly formed affiliate created for that purpose—of the same assets that ABR was attempting to procure. Thus, as a result of Defendants' alleged "interference," "self-dealing," and self-enrichment, ABR was deprived of the benefits it anticipated from the ownership and operation of the storage, terminal, and refinery facilities—benefits which, Plaintiff argues, ABR would have received "absent Defendant's acts," and the loss of which forms the bases of Plaintiffs claims in Counts I, V, and VII. As noted in *In re Christ Hosp.*, "[t]he overarching factor [] is whether [plaintiff's] claims have an 'undeniable linkage' to the property being sold in the bankruptcy proceeding." 502 B.R. at 172 (internal citation and quotations omitted). Such a linkage clearly exists here. ABR's claims in Counts I, V, and VII are therefore "interests" under § 363(f) which are barred by the Bankruptcy Court's Sale Order.

Plaintiff's arguments to the contrary do not alter the Court's conclusion. ABR contends that *In re Christ Hosp.* is distinguishable because "that case involved a claim directly premised on the bankruptcy process, based upon an alleged subversion of that process to drive down the price paid for certain assets of the debtor." (Dkt. No. 30 at 22). While it is true that the facts of *In re Christ Hosp.*, are not identical to those in the instant matter, the case-by-case analysis that is called for in determining what constitutes an "interest" under § 363(f), 502 B.R. at 171, suggests that the focus is more appropriately placed on the essence of the bankruptcy court's ruling. "The overarching factor" is whether there is a linkage or connection between Plaintiff's claims and the purchased assets. *Id.* at 172. As discussed above, with regard to Counts I, V, and VII, ABR's

"stated factual claims are connected to, or arise from, the [sold] property." *Id.*

Moreover, the fact that ABR is not seeking to challenge the bankruptcy proceedings or undo the bankruptcy sale (Dkt. No. 30 at 22-23, 24), does not change the outcome. *See In re Christ Hosp.*, 502 B.R. at 177. Simply put, at the heart of Plaintiffs' claims in Counts I, V, and VII is that Defendants deliberately acted to thwart ABR's efforts to acquire the Hovensa assets, and Plaintiff now seeks recompense for the loss that it suffered. The District Court's reasoning in *In re Christ Hosp.*, is instructive here:

> It is the nature of Prime's common-law claims—which arose prepetition and continued post-petition—that "are connected to, or arise from, the property being sold" and thus fall within the scope of § 363(f). *See In re Trans World Airlines, Inc.,* 322 F.3d at 289 (citing *Folger Adam,* 209 F.3d at 259). Prime's argument fails. It argues that its 'state court action does not allege any interest in Christ Hospital property,' but arises 'from Hudson's *pre-bankruptcy action meant to undermine* Prime Healthcare's contract to purchase Christ Hospital.' [] But Prime improperly divorces the factual allegations that are connected to the hospital assets being sold, i.e., the pre-petition [Asset Purchase Agreement] that Prime withdrew, allegedly as a result of Hudson's bad faith, that led to the "forced" bankruptcy sale of Christ Hospital's assets at a lower price. As such, the common-law claims were "interests" in the sale of Christ Hospital's assets that were entitled to free and clear protections in the Sale Order and Confirmation Order.

*In re Christ Hosp.*, 2014 WL 4613316 at *12 (D.N.J. Sept. 12, 2014) (emphasis added).

As in *In re Christ Hosp.*, Plaintiff here is challenging Defendants' "pre-bankruptcy action meant to undermine" ABR's efforts to acquire Hovensa's assets (Dkt. No. 30 at 17-18, 25), and contends that such a challenge allows it to escape the scope of "interests" under § 363(f) that are barred by the Bankruptcy Court's Sale Order. (Dkt. No. 30 at 17-19, 25). In making this argument, Plaintiff, like Prime, "divorces the factual allegations that are "connected to the [Hovensa] assets" that were sold. Evidence of this connection is manifest in various allegations in the Amended Complaint. For example, Plaintiff describes how "ArcLight Steals the Deal," by alleging:

> Defendants then proceeded, without ABR's knowledge or participation, to negotiate with HOVENSA an Asset Purchase Agreement . . . to purchase -- through a newly-

formed ArcLight subsidiary, Limetree Bay Holdings [] -- the same marine terminal and storage facility which the Defendants had agreed to lease pursuant to the Letter Agreement, for the same amount of money the Defendants were to pay under the Letter Agreement ($190 million), but without having to share in the ownership with ABR.

(Dkt. No. 14 ¶54). Plaintiff continues:

Defendants negotiated the Letter Agreement with ABR under false pretenses . . . Defendants acted with the purpose and intent to convert ABR's activities and efforts, . . . to gain access to HOVENSA and the Refinery Facility, to co-opt for their own purposes the goodwill and preferred negotiating position enjoyed by ABR (while excluding ABR from the transaction), and ultimately, to execute an Asset Purchase Agreement to acquire the terminal facility only.

*Id.* ¶ 58. Again, in Plaintiff's own words:

Defendants acted in bad faith . . . to secure for ArcLight ABR's share of the marine terminal and storage business, and by strategically withdrawing ArcLight's financial commitment at a time that left, and which ArcLight knew would leave, ABR without the ability to secure another financial partner and proceed with the transaction, and thereby eliminated [ABR] . . . in order to make straight the path for the Defendants to acquire the marine terminal and storage business for its own account.

*Id.* ¶ 106.[14] Thus, Plaintiff's attempt to avoid the Sale Order's injunction's reach is to no avail.

In addition, the fact that Defendants' alleged bad faith conduct occurred prior to the bankruptcy proceedings is also of no import here. (Dkt. No. 30 at 17-18). The Sale Order declared that "interests" were prohibited "*whether arising prior to or subsequent to the commencement of this Chapter 11 Case*." (Sale Order ¶ V) (emphasis added). Indeed, the bankruptcy court in *In*

---

[14] Plaintiffs' claims are replete with allegations that Defendants acted in bad faith which resulted in "undermining," "eliminating," "damaging," and "depriving" ABR of its expected benefits from the Hovensa transaction and securing for Defendants the Hovensa assets. For example in Count I, Plaintiffs allege that "Defendants *manipulated ABR in bad faith* in order to frustrate ABR's ability to acquire the [Hovensa] site." (Dkt. No. 14 ¶ 67) (emphasis added). In Count V, Plaintiffs allege that Defendants indulged in "self-dealing" and "*enriched themselves by co-opting* the terminal and storage facility and taking for themselves Plaintiff's share of the terminal and storage business." *Id.* ¶¶ 94-95 (emphasis added). Finally, in Count VII, Plaintiffs allege that "*Defendants acted in bad faith*, against ABR's interests and in favor of their own, to secure for ArcLight ABR's share of the marine terminal and storage business." *Id.* ¶ 106 (emphasis added).

*re Christ Hosp.*, noted: "§ 363(f), would have little functional value if interests created prepetition were not to be affected [by the sale order]. *Hence, it is not the timeline that controls [], but rather the nature of the interest at issue*." 502 B.R. at 170 (emphasis added); *see also In re Christ Hosp.*, 2014 WL 4613316 at *11 (D.N.J. Sept. 12, 2014) ("courts have routinely included interests that arose pre-petition under Section 363(f)"); *Food King, Inc. v. Norkus Enter., Inc.*, 2006 WL 3674997, at *4-6 (D.N.J. Dec. 13, 2006) (finding that whether defendants' tortious conduct occurred prior to the bankruptcy sale is not relevant for the purpose of considering whether its claims are barred by the sale order); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 148-9 (3d Cir. 1986) (examining the purchaser's conduct prior to the sale).

Further, Plaintiff's argument that they should not be subject to the Sale Order because its claims here are not against Limetree, is also unavailing. (Dkt. No. 30 at 22-25). The Sale Order plainly encompasses Defendants in its scope because it bars any "Interests" asserted against "the Buyer, *any of its Affiliates* and Subsidiaries." (Sale Order ¶ 10) (emphasis added). The Buyer here was Limetree, which is affiliated with both Defendants ArcLight and JP Energy—facts that are not in dispute.[15] Thus, the Sale Order covers this lawsuit against Defendants.

---

[15] In the Amended Complaint, Plaintiff itself recognizes the connection between Defendants and Limetree. (See e.g., Dkt. No. 14 ¶ 38) ("Defendants . . . [then] proceeded to divert the transaction to ArcLight and its subsidiaries"); *id*. ¶ 54 ("Defendants then proceeded . . . to negotiate with Hovensa an Asset Purchase Agreement [] to purchase—through a newly-formed ArcLight subsidiary, [Limetree]—the same marine terminal and storage facility"). Separate entities, such as Limetree and JP Energy, are affiliated with each other if they have the same parent company, i.e., ArcLight. *Geo-Cleanse Int'l, Inc. v. In-Situ Technieken, B.V.*, 2008 WL 183740, at *1 (D.N.J. Jan. 18, 2008); a*ccord Shoop v. Devon Energy Prod. Co., L.P.*, 2013 WL 12251353, at *2 (N.D. Tex. Mar. 28, 2013)*; Axis Specialty Ins. Co. v. Doty-Moore Tower Servs., LLC*, 2008 WL 11335004, at *7 (N.D. Ga. Sept. 22, 2008); *Gomez v. MasTec N. Am., Inc.*, 284 F. App'x 517, 519 (9th Cir. 2008).

Finally, as in *In re Christ Hosp.*, Plaintiff did not object or intervene in the bankruptcy proceedings to protect its interests. (*See* Sale Order at 2-4; 7-8). ABR's conduct is thus properly deemed "consent" to releasing its claims that were derivative of the purchased assets. *In re Christ Hosp.*, 502 B.R. at 174 ("given adequate notice, failure to object to a § 363 sale has been found to constitute consent per § 363(f)(2) to a 'free and clear' sale of the nonobjector's interests in property being sold").[16]

In sum, the Court finds that Plaintiff's claims in Counts I, V, and VII, are "interests" which are "connected to, or arise from," the purchased Hovensa assets, and they were extinguished by the Bankruptcy Court's Sale Order which established that Hovensa's assets were sold "free and clear" pursuant to § 363(f). *Folger Adam*, 209 F.3d at 259. As such, Plaintiff's claims constitute an impermissible collateral attack on the Bankruptcy Court's Sale Order. The impermissibility of such collateral attacks is well grounded in law. *See Celotex*, 514 U.S. at 313 (holding that a collateral attack on a bankruptcy order cannot be allowed "without seriously undercutting the orderly process of law"). The Court will therefore dismiss Plaintiff's Counts I, V, and VII with prejudice.[17]

---

[16] The parties also argue as to whether the Sale Order's "good faith" finding pursuant to 11 U.S.C. § 363(m) was limited only to Limetree, as the purchaser of Hovensa's assets, or whether it also encompassed Defendants. Defendants contend that the good faith finding also included them as affiliates of Limetree and thus "protected" them from Plaintiff's claims. (Dkt. No. 19 at 20; Dkt. No. 34 at 9, 13). In contrast, Plaintiff argues that the Sale Order's "good faith" finding applied only to Limetree and not Defendants. (Dkt. No. 30 at 19). However, because the Court has found that Plaintiff's claims constitute a collateral attack on the "free and clear" provisions of § 363(f), it need not address the good faith issue.

[17] In its Response to Defendants' Motion to Dismiss, Plaintiff relies on *Copelin v. Sprico, Inc.*, 182 F.3d 174, 181 (3d Cir. 1999) to argue that Defendants, neither of whom were non-debtors in the bankruptcy proceedings here, cannot use the bankruptcy proceedings to insulate themselves from ABR's claims for liability that existed outside of the bankruptcy. (Dkt. No. 30 at 23-25). The Court, however, finds *Copelin* inapposite. *Copelin* did not involve a sale order from the bankruptcy court. Rather, the issue in *Copelin* was whether plaintiff, who sued and won a state court judgment

### 3.    Counts II, III, IV, and VI

On the other hand, the Court finds that Defendants' alleged breach of the NDA and Plaintiff's claims related thereto—specifically Counts II, III, IV, and VI—are not "interests" that are "connected to, or arise from," the purchased Hovensa assets. Instead, the source of these claims arose independently from an NDA between Plaintiff and Defendant ArcLight, which Defendants allegedly breached by using Confidential Information provided by ABR for their own self-dealings outside the parameters of the NDA. *See In re Farmland Indus., Inc.*, 376 B.R. at 725 (noting that if plaintiff's complaint "alleges a truly independent tort," it is not considered a collateral attack on the sale orders).[18]

That the claims in Counts II, III, IV, and VI are not "interests" barred by the Bankruptcy Court's Sale Order is confirmed by a review of the Counts. In Count II, Plaintiff alleges that "[p]ursuant to the NDA, ABR presented troves of valuable [Confidential Information] to Defendants, including business information, plans, strategies, projections, engineering information and financial models," much of which were "developed by ABR over a period of several years." (Dkt. No. 14 ¶ 74-75). Plaintiff goes on to allege that "Defendants used ABR's Confidential

---

for unpaid wages, had the right to collect that judgment from the defendant—a non-debtor who only became involved in a bankruptcy court proceeding because an Amended Reorganization Plan absorbed the debtor into defendant as the former's parent corporation. 182 F.3d at 180. The Court found that the issue of whether defendant owed plaintiff on the state court judgment was a non-core proceeding, i.e., an issue that did not arise from bankruptcy law, and that the Amended Reorganization Plan did not include plaintiff's state court judgment against defendant. Thus, plaintiff's claim against defendant was not discharged by the bankruptcy and was thus payable by defendant. *Id*. at 180-183. The issue in the instant matter, however, is whether Plaintiff's claims are "interests" under § 363(f) that are "connected to or, or arise from," the purchased Hovensa assets—a completely different issue and context from that in *Copelin*.

[18]  At one point, Defendants contend that "[i]n this matter, the only alleged relationship between the Plaintiff and any other entity is the [Letter Agreement]." (Dkt. No. 19 at 33). This argument completely ignores the existence of a separate contract, i.e., the NDA, to which the Amended Complaint refers repeatedly.

Information in analyzing the terminal and refinery business and self-dealing with Hovensa to appropriate ABR's business plans for ArcLight," in violation of the NDA, and that even after purchasing the Hovensa assets, "Defendants continued to use the Confidential Information in breach of the NDA." *Id*. ¶ 76.

In Count III, Plaintiffs allege that "Defendants have used and continue to use Plaintiff's Confidential Information (as defined in the NDA) in the acquisition and development of operational plans for the Hovensa facility," in violation of the NDA. *Id*. ¶ 80. Thus, Plaintiff seeks an injunction against Defendants to prevent them from "further us[ing]" the Confidential Information. *Id*. ¶ 82.

Meanwhile, in Count IV, Plaintiff alleges that "ABR took steps to protect the secrecy of its plans and other [Confidential Information], as these were disclosed to Defendants pursuant to [the] NDA, with the express understanding that the material would be confidential." *Id*. ¶ 85. Plaintiff further alleges that "Defendants misappropriated this information," and "are using information gained from ABR in their dealings with [Hovensa] and future plans for the Terminal Facility." *Id*. ¶¶ 89-90.

Finally, in Count VI, Plaintiff alleges that "ABR conferred a benefit on Defendants, *inter alia*, [by] introducing Defendants to the transaction and ABR's strategies, plans and analyses for the purchase, restart and operation of the Refinery Facility," and by "also negotiat[ing] [a] resolution of complex environmental issues relating to the Refinery Facility with [the] EPA to facilitate the operation of the refinery." *Id*. ¶¶ 98-99. Plaintiff also alleges that "Defendants later improperly used the introduction and information for their own benefit, appropriated selected portions of the transaction and ran with it on their own." *Id*. ¶ 98. In addition, Plaintiff alleges that "Defendants accepted and retained the benefits of the terminal purchase, using ABR's strategies,

plans and analyses, and working from ABR's prior neg[oti]ations . . . but failed to honor its financial commitment to ABR in order for ABR to close pursuant to the Purchase and Sale Agreement." (Dkt. No. 14 ¶ 100).

These claims are not linked to the sold property as with Counts I, V, and VII, but rather are focused on the NDA and the alleged breach resulting from Defendants' allegedly improper use of Confidential Information. Accordingly, the Court finds that the claims in Counts II, III, IV, and VI are not "interests" that are "connected to, or arising from," the Hovensa assets that were sold at the bankruptcy auction, and therefore are not barred by the Bankruptcy Court's Sale Order.

## IV.    THE *IQBAL/TWOMBLY* ANALYSIS

The Court now turns to whether Plaintiff's remaining claims, while not barred by the Sale Order, are otherwise subject to dismissal for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 19 at 23-36). For the reasons discussed below, Defendants' Motion to Dismiss Plaintiff's remaining claims pursuant to Rule 12(b)(6) will be granted as to Counts II and IV, with leave to amend, and denied as to VI. Count III will be dismissed with prejudice for failure to state a cause of action.

### A.    Applicable Legal Principles

Federal Rule of Civil Procedure 12(b)(6) calls for dismissal of a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need not provide detailed factual allegations, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); rather, the question is whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). While the Court accepts all well-pleaded allegations in the complaint as true and draws

all reasonable inferences in favor of the nonmoving party in determining a motion to dismiss, *Capogrosso v. The Supreme Court of New Jersey,* 588 F.3d 180, 184 (3d Cir. 2009), a plaintiff cannot rely on mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Twombly,* 550 U.S. at 555; s*ee also Emrit v. Indep. Music Awards, IMA*, 605 Fed. App'x. 103, 104 (3d Cir. 2015) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to defeat a Rule 12(b)(6) motion to dismiss) (quoting *Iqbal*, 556 U.S. at 678)*; Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth.") (internal citation and quotations omitted)); *McTernan v. City of York, Penn.,* 577 F.3d 521, 531 (3d Cir. 2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.") (quoting *Iqbal,* 556 U.S. at 678). Rather, a plaintiff must cite enough facts to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678.

To establish facial plausibility, the plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant may be liable for the misconduct alleged. *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 679 (internal quotations and citation omitted). Determining whether the well-pleaded facts plausibly give rise to a claim for relief "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786-7 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679) (quotations omitted).

Under the plausibility standard, when considering whether dismissal is appropriate, a court must: (1) "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) "identify

allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) where there are "well-pleaded factual allegations, [] assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Smith v. Virgin Islands Hous. Auth.*, 2016 WL 2637824, at *3 (D.V.I. May 6, 2016) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (internal quotation marks and ellipses omitted)).[19] The Court will now examine Plaintiff's remaining causes of action.

## B.    Analysis

### 1.    Counts II and IV: Breach of Contract and Misappropriation

Because Plaintiff's claims in Counts II and IV pertain to the parties' NDA, the Court will apply that contract's express choice of law provision, requiring these claims to be examined under the laws of the state of Delaware. (NDA ¶ 15) ("The Agreement shall be governed by the laws of the State of Delaware, without regard to the principles of conflict of laws thereof."). *See Bell v. USAA Cas. Ins. Co.*, 2009 WL 2524351, at *2 (D.V.I. Aug. 14, 2009) ("a contract is interpreted according to the law chosen by the parties so long as the particular issue is one which the parties [] resolved by an explicit provision in their agreement directed to that issue") (internal citation and quotations omitted).

Plaintiff's breach of contract and misappropriation claims involve the following allegations. ABR and Defendant ArcLight entered into a non-disclosure agreement in this matter on February 10, 2015. (Dkt. No. 14 ¶¶ 30, 71; NDA, Dkt. No. 14-1). The NDA prohibited either party from using any Confidential Information for any purpose other than to explore the parties'

---

[19] While *Iqbal* describes the process as a "two-pronged approach," the Supreme Court took note of the elements a plaintiff must plead to state a claim before proceeding to its two-step approach. Accordingly, the Third Circuit has deemed the process a three-step approach. *Santiago*, 629 F.3d at 130 n.7.

prospective business relationship pertaining to the acquisition of Hovensa's storage and terminal facility and refinery. (Dkt. No. 14 ¶ 31; NDA ¶ 1). According to Plaintiff, ABR shared with Defendants "troves of valuable [Confidential Information]"—much of which was developed by ABR over several years prior to its dealings with Defendants—with the express understanding that it would be kept confidential. (Dkt. No. 14 ¶¶ 74-75, 85). This material allegedly included "analyses, modeling, business strategies and other information not available elsewhere and of significant and tangible value to anyone seeking to enter the refinery or terminal business in St. Croix." (Dkt. No. 14 ¶ 75). ABR's materials also allegedly contained "novel ideas on how to revive the [] terminal and refinery . . . [and] detailed supporting financial models and projections, operational plans and engineering plans for both the terminal/storage and the reengineering and restart of the refinery." (Dkt. No. 14 ¶ 86). This Confidential Information allegedly "allowed Defendants to fully understand the economic opportunities afforded by the facility and to have access to a fully developed plan to realize those opportunities." (Dkt. No. 14 ¶ 34).

Plaintiff alleges that Defendants "used ABR's [Confidential Information] in analyzing the terminal and refinery business and self-dealing with Hovensa to appropriate ABR's business plans for ArcLight," and continued to use the Confidential Information after the Hovensa purchase was completed. (Dkt. No. 14 ¶ 76). ABR also alleges that, as of the filing of the Complaint, Defendants were still using ABR's Confidential Information "in their dealings with Hovensa and their future plans for the Terminal Facility." (Dkt. No. 14 ¶ 89). Accordingly, per Plaintiff, Defendants breached the NDA and "ABR has been damaged by Defendants' appropriation of its business ideas, plans and strategies, and using such information to pursue the Hovensa transaction without ABR." (Dkt. No. 14 ¶¶ 76, 90).

Defendants argue that Plaintiffs' claims are speculative. (*See* Dkt. No. 19 at 28-31). In this regard, Defendants contend, *inter alia*, that the "Complaint only generically describes Plaintiff's so-called strategic information" (Dkt. No. 19 at 28); that Plaintiff fails to identify what information Defendants supposedly misused (*Id*. at 30); and that Plaintiff fails to specify "how Defendants used th[e] information improperly." (*Id*. at 29).

Under Delaware law, to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim for breach of contract, the plaintiff must demonstrate: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The final element requires a plaintiff to demonstrate "both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013).

Plaintiff's claim for breach of contract is factually insufficient to survive a Rule 12(b)(6) motion to dismiss. Specifically, the allegations in the Amended Complaint do not include sufficient facts for the second element which, at this stage, calls for a "showing," for plausibility purposes, of a breach. *See Phillips,* 515 F.3d at 232-34 (finding that the plausibility standard under *Twombly* requires plaintiffs to provide a "showing" which sets forth "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element") (quoting *Twombly*, 550 U.S. at 545).

In its Amended Complaint, Plaintiff states that "Defendants used ABR's Confidential Information in analyzing the terminal and refinery business and self-dealing with Hovensa to appropriate ABR's business plans for ArcLight." (Dkt. No. 14 ¶ 76). While the Court finds—

contrary to Defendants' argument (Dkt. No. 19 at 28-29)—that Plaintiff has sufficiently identified the types of confidential material at issue,[20] the Complaint does not include any factual allegations to support Plaintiff's conclusory allegation that Defendants "used" this confidential material. For example, the Complaint mentions "no specific time, place, or person involved" in the alleged use of Plaintiff's Confidential Information. *See Twombly*, 550 U.S. at 565 n. 10. In contrast, in *NACCO Indus., Inc. v. Applica Inc.*, the court found that the complaint contained sufficient allegations to support a claim for breach of contract in part because plaintiff was able to pinpoint the dates and the precise manner as to how the defendant violated the contract's exclusivity and confidentiality provisions, as well identify the persons involved. 997 A.2d 1, 15 (Del. Ch. 2009); *see also Eastman Chem. Co. v. AlphaPet Inc.*, 2011 WL 5402767, at *12-13 (D. Del. Nov. 4, 2011), *report and recommendation adopted,* 2011 WL 6148637 (D. Del. Dec. 9, 2011) (denying a motion to dismiss plaintiff's claim for breach of confidentiality agreement because plaintiff was able to identify the disclosed information, the source, and the circumstances giving rise to its breach of contract claim, i.e., "where and when [confidential] statements] were made, and which person or company made them").

---

[20] Plaintiff claims that the Confidential Information impermissibly used by Defendants included "business information, plans, strategies, projections, engineering information and financial models," which provided information "of significant and tangible value to anyone seeking to enter the refinery or terminal business in St. Croix." (Dkt. No. 14 ¶¶ 74-76). This description of material is factually sufficient as the NDA broadly defines what constitutes "Confidential Information" and the materials alleged fall within its scope. (See NDA ¶ 2). *Wiggins v. Physiologic Assessment Servs., LLC*, 141 A.3d 1058, 1065 (Del. Super. Ct. 2016) (finding Defendant had sufficiently pleaded its misappropriation counterclaim by specifically defining its "confidential [and] proprietary information" at issue as, *inter alia*, "billing methods, processes and practices, customer lists and contact information, services ordered, ordering patterns, insurance company relationships, and other billing and collections information, as well as the names of all of its physician and hospital customers, the contact information of its customers' payers, and billing codes").

Moreover, to adequately state a claim for breach of contract under Rule 12(b)(6), Plaintiff must do more than simply assert that, "[a]fter completing the Hovensa purchase, Defendants continued to use the Confidential Information *in breach* of the NDA." (Dkt. No. 14 ¶ 76) (emphasis added). "Conclusory allegations will not be accepted as true without specific supporting factual allegations." *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 66 (Del. 1995). Indeed, "[s]tating that a contract was breached is merely a legal conclusion," and "[c]onclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." *Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc.*, 170 F. App'x 805, 808 (3d Cir. 2006) (quoting *DM Research, Inc., v. Coll. of Am. Pathologists,* 170 F.3d 53, 55 (1st Cir.1999)). Such lack of factual information fails to give Defendants "fair notice" of the grounds upon which Plaintiff's claim for a breach of contract rests. *Twombly,* 550 U.S. at 555. Accordingly, the Court finds that Plaintiff has not stated sufficient facts for the Court to conclude that it has a plausible claim for breach of contract against Defendants.

Plaintiff's misappropriation claim fails for similar reasons. To assert a claim for misappropriation of confidential information under Delaware law, a plaintiff must meet the following elements: (1) "it had a property interest in the confidential information; (2) [] the defendant wrongfully exerted dominion over the confidential information; and (3) [] the plaintiff sustained damages as a result." *Sustainable Energy Generation Grp., LLC v. Photon Energy Projects B.V.*, 2014 WL 2433096, at *14 (Del. Ch. May 30, 2014).[21]

---

[21] In its Motion to Dismiss, Defendants analyze this claim under misappropriation of a trade secret. (Dkt. No. 19 at 29-30). However, while claims for misappropriation of a trade secret and misappropriation of confidential information may have analytical similarities, they are two separate claims under Delaware law. The former is a statutory claim under the Delaware Uniform Trade Secrets Act ("DUTSA") and the latter is a claim under common law. *Adtile Techs. Inc. v. Perion Network Ltd.*, 2016 WL 3457152, at *3-4 (D. Del. June 23, 2016). A review of the Amended Complaint suggests that Plaintiff is asserting a common law claim as there is no mention

Plaintiff falls short in setting forth sufficient facts to meet the plausibility standard for the second element, i.e., that Defendants wrongfully exerted dominion over the Confidential Information. Here, again, Plaintiff relies on conclusory allegations, stating that "Defendants *misappropriated* this [Confidential] [I]nformation which ABR presented to Defendants for use in acting as ABR's partners." (Dkt. No. 14 ¶ 84) (emphasis added). The Court must similarly disregard Plaintiff's conclusory assertions that Defendants "follow[ed] through on the ideas and plans developed by ABR and disclosed to Defendants" in "improperly negotiat[ing] with Hovensa" (Dkt. No. 14 ¶ 87), and that "ABR has been damaged by Defendants' *appropriation* of its business ideas, plans and strategies, and *using* such information to pursue the Hovensa transaction without ABR" (Dkt. No. 14 ¶ 90) (emphasis added). These assertions also lack factual allegations as to how and in what way Defendants appropriated and used Plaintiff's confidential material.

In *Sustainable Energy Generation,* the parties executed a confidentiality agreement to explore a partnership for potential business projects, whereupon plaintiff shared confidential information with defendants pursuant to a non-disclosure agreement. 2014 WL 2433096 at *1. The

---

of DUTSA. (Dkt. No. 14 ¶ 83-91). However, Plaintiff defended a purported trade secret claim by arguing in its Response that "the issue of whether or not [Confidential Information] alleged to have been misappropriated is a 'trade secret,' is a question of fact which is inappropriate at the motion to dismiss stage." (Dkt. No. 30 at 30). While the Court agrees with Plaintiff's contention, *see e.g., Beard Research, Inc. v. Kates*, 8 A.3d 573, 591 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010), any trade secret claim should be clearly identified, and would, in any event, suffer from the same deficiency as the common law claim discussed above. Under Delaware law, "to maintain a successful claim for misappropriation of trade secrets, a plaintiff must show both the existence of a trade secret and its misappropriation." *Id*. at 589. DUTSA defines misappropriation of a "trade secret" as the "a*cquisition, disclosure, or use* of a trade secret through improper means or in conjunction with another who acquired the secret by improper means." *Id*. at 597 (emphasis added). As in the common law claim discussed above, Plaintiff has not pleaded sufficient facts to identify how Defendants disclosed or used alleged trade secrets.

parties ultimately did not consummate a partnership, with plaintiff alleging that the defendants' main intention was never to partner with plaintiff but to acquire the latter's confidential information for their own self-dealing, i.e., to help them raise capital via a bond offering. *Id*. The plaintiff alleged that during a public meeting with prospective investors, defendants impermissibly incorporated plaintiff's confidential information in several materials it distributed and presented to the investors, precipitating plaintiff's suit which included claims for breach of contract and misappropriation of confidential information. *Id*. at *4-5.

In denying defendants' Rule 12(b)(6) motion to dismiss, the court found that plaintiff had adequately pleaded factual allegations that supported these claims—namely, that plaintiff was able to identify with specificity when, how, and in what circumstances its confidential information was improperly disclosed by defendants, i.e., during two investor presentations and by inclusion of the information in credit analyst reports handed out to third-parties. *Id.* at *12-15 ("[I]t is reasonably conceivable that [plaintiff's confidential information] appeared in those reports as a result of Defendant's disclosures and remains publicly available in violation of the [non-disclosure agreement]"). Thus, the court concluded that "because it is reasonably conceivable that Defendants used or disclosed impermissibly [plaintiff's] confidential information, it is also reasonably conceivable that Defendants wrongfully exerted dominion over [plaintiff's] confidential Proprietary Information," for the purposes of the second element of a misappropriation claim. *Id*. at *15.

Here, in contrast, the dearth of facts in the Amended Complaint prevents the Court from concluding that a sufficient showing has been made for the Court to conclude that ABR has a plausible claim for relief as to Defendants' alleged impermissible use of ABR's Confidential Information. Unlike in *Sustainable Energy Generation*, Plaintiff's factual allegations do not

include information addressing how, when, where, and by and to whom ABR's Confidential Information was improperly disclosed. Instead, Plaintiff only vaguely describes the alleged violations, such as Defendants having "improperly negotiated with Hovensa for the terminal only[, having] *follow[ed] through* on the ideas and plans developed by ABR and disclosed to Defendants" (Dkt. No. 14 ¶ 87) (emphasis added); and Defendants "*using* information gained from ABR in their dealings with Hovensa and future plans for the Terminal facility." (Dkt. No. 14 ¶ 89) (emphasis added). Such conclusory descriptions do not meet the plausibility standard under *Twombly*, wherein the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Phillips,* 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555). Accordingly, Plaintiff has failed to make a sufficient showing of plausibility with regard to the second element of a misappropriation claim.

In sum, because Plaintiff has not sufficiently pleaded claims for a breach of contract or misappropriation (either common law or under DUTSA) to survive a Rule 12(b)(6) Motion, the Court will dismiss Counts II and IV against Defendants for failure to state a claim. However, while Plaintiff's claims in Counts II and IV are deficient and are thus subject to dismissal, "district courts are instructed to provide the plaintiff with leave to amend even if the plaintiff has not requested such leave," unless the district court finds that amendment would be inequitable or futile. *Great Bay*, 2015 WL 4531715 at *6 (citing *Phillips,* 515 F.3d at 245). Here, the Court is unaware of any basis for concluding that amendment would be inequitable or futile. Accordingly, the Court will dismiss Counts II and IV without prejudice, and with leave to further amend the Complaint to address the deficiencies identified herein.

## 2. Count III: Breach of Contract (Injunction)

The NDA contains a provision authorizing either party to obtain an injunction to prevent a party from "breaching or continuing to breach" any non-disclosure and confidentiality provisions in the Agreement. (NDA ¶ 10). Plaintiff requests an injunction against Defendants, alleging that "Defendants have used and continue to use Plaintiff's Confidential Information (as defined in the NDA) in the acquisition and development of operational plans for the Hovensa facility." (Dkt. No. 14 ¶ 80).

Plaintiff's request in this regard does not state a cause of action because it is instead a request for a certain type of relief. *Chruby v. Kowaleski,* 534 F. App'x 156, 160 n. 2 (3d Cir. 2013) ("injunction is a remedy rather than a cause of action, so a separate claim for injunctive relief is unnecessary"); *accord Townsend v. E. Specialty Fin., Inc.*, 2015 WL 604074, at *2 (D. Del. Feb. 12, 2015) ("[i]njunctive relief is a remedy, not a cause of action") (citing *Birdman v. Office of the Governor,* 677 F.3d 167, 172 (3d Cir. 2012)); s*ee also Slemmer v. McGlaughlin Spray Foam Insulation, Inc.,* 955 F. Supp. 2d 452, 465 (E.D. Pa. 2013) ("A pleading can request injunctive relief in connection with a substantive claim, but a separately pled claim or cause of action for injunctive relief is inappropriate.") (internal citation, quotation marks and ellipses are omitted); *Tolia v. Dunkin Brands,* 2011 WL 6132102, at *6 n.5 (D.N.J. Oct. 7, 2011) *report and recommendation adopted,* 2011 WL 6132271 (D.N.J. Dec. 7, 2011) (citing cases from various federal jurisdictions finding that injunction is not a distinct cause of action). In other words, such relief is more properly construed as a remedy for Defendants' alleged breach of contract, but not a separate cause of action. Accordingly, the Court will dismiss Count III of the Amended Complaint against Defendants for failure to state a claim and allow Plaintiff in a Second Amended Complaint to seek injunctive relief as an additional remedy for the alleged breach of contract.

### 3. Count VI: *Quantum Meruit*

Plaintiff asserts *quantum meruit* as another cause of action against Defendants. In support of its *quantum meruit* claim, Plaintiff alleges that it has conferred upon Defendants benefits for which ABR has not been fully compensated, and that it would be "inequitable" to allow Defendants to retain these benefits without compensation to Plaintiff. (Dkt. No. 14 ¶¶ 97-101). These benefits include "ABR's strategies, plans and analyses," and ABR's "neg[oti]ations with Hovensa, the Government of the Virgin Islands, and the United States [Environmental Protection Agency]." (Dkt. No. 14 ¶ 100).

Defendants contend that Count VI fails to state a claim upon which relief can be granted because there is no right to bring an action based on quasi-contract principles where an express contract governs. (Dkt. No. 19 at 31-32). Specifically, Defendants argue that because the parties' Letter Agreement "governs the subject matter of the dispute, claims in quasi-contract are barred." (Dkt. No. 19 at 32).

In response, Plaintiff argues that the NDA, and not the Letter Agreement, governs its claims. (Dkt. No. 30 at 31 n. 24). According to Plaintiff, its "action is based on a[] signed NDA that [D]efendants violated which was the direct cause of the damage to Plaintiffs." *Id*. Plaintiff further argues that, even assuming it had brought a breach of contract claim under the Letter Agreement, ABR is "permitted to plead alternative theories of recovery based on breach of contract and unjust enrichment in cases where [as here] there is a 'question as to the validity of the contract in question.'" (Dkt. No. 30 at 31).

In their Reply, Defendants argue that pleading alternative theories of recovery is limited to instances where the contract's validity is disputed but that no party here has challenged the validity of the Letter Agreement. (Dkt. No. 34 at 18). Further, Defendants insist that it is the Letter

Agreement which governs Plaintiff's quasi-contract claims because it specifically covers ABR's expectations with regard to the acquisition of Hovensa and details the financial terms of the parties' relationship. (Dkt. No. 19 at 33; Dkt. No. 34 at 18). Thus, because the Letter Agreement expressly governs this issue, Defendants contend that dismissal of Plaintiff's *quantum meruit* claim is warranted. (Dkt. No. 34 at 19).

The Court agrees with Plaintiff, based on the information currently before the Court, that it is the NDA, not the Letter Agreement, that governs Plaintiff's quasi-contract claims. Plaintiff's factual allegations in its Amended Complaint describe the benefits Plaintiff "conferred" upon Defendants as its introduction to the Hovensa transaction, its negotiations with various governmental entities, and "its strategies, plans and analyses for the purchase, restart and operation of the Refinery Facility." (Dkt. No. 14 ¶¶ 98, 100). As in its breach of contract and misappropriation claims, Plaintiff alleges that "Defendants later improperly used the introduction and information for their own benefit, appropriated selected portions of the transaction, and ran with it on their own." *Id.* ¶ 98. Even Plaintiff's claims that Defendants exploited both Plaintiff's introduction to the Hovensa business opportunity, *id.* ¶ 98, and Plaintiff's prior negotiations with Hovensa and other governmental parties, *id.* ¶ 99-100, implicate the NDA because information from Plaintiff's introduction, relationships, and negotiations, are seemingly part of the confidential material which Plaintiff offered Defendants. Accordingly, because the Court finds that the parties' NDA governs the issue at hand, it will apply Delaware law in its analysis of Plaintiff's claim, in accordance with the NDA's choice of law provision.

Quantum meruit is "a quasi-contract claim that allows a party to recover the reasonable value of his or her services." *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004); a*ccord Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*, 540 F. Supp. 2d 528, 536 (D. Del. 2008), *aff'd on*

*other grounds,* 319 F. App'x 137 (3d Cir. 2009) ("Quantum meruit means literally 'as much as he deserves' and permits a plaintiff to recover the reasonable value of the services he provided to the defendant in the absence of a contract, provided those services were not gratuitous"). Applying this theory allows a plaintiff to "ask the Court to imply a promise by defendants to pay for plaintiff's extra work. Such an implied promise to pay for work performed gives rise to a quasi-contract upon which plaintiff may recover." *Id.* at 988.

The Court agrees with Defendants that there generally is no right to bring an action based on quasi-contract principles, such as *quantum meruit*, where an express contract governs. (Dkt. No. 19 at 31-32); *Patterson Woods & Assocs., LLC v. Realty Enter., LLC*, 2008 WL 2231511, at 15 (Del. Super. Ct. May 21, 2008) (finding "where an enforceable contract exists between the parties, recovery on a theory of *quantum meruit* is inapplicable."); a*ccord J.A. Moore Const. Co. v. Sussex Assocs. Ltd. P'ship*, 688 F. Supp. 982, 988 (D. Del. 1988) ("[t]he existence of an express agreement, whether written or oral, precludes the finding of a quasi-contract."). However, the Court also recognizes that in addition to a contract claim, a party may also seek a *quantum meruit* claim in the alternative. *Cavi v. Evolving Sys., Inc.*, 245 F. Supp. 3d 604, 605 (D. Del. 2017); *Greenberg v. Thomas Edison Charter Sch.*, 2011 WL 6210632, at *2 (Del. Com. Pl. Nov. 21, 2011); s*ee also Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 522 (2009) ("The fact that plaintiff pleaded the existence of a written contract does not preclude it from pleading *quantum meruit* in the alternative."); *TSC Research, LLC v. Bayer Chemicals Corp.*, 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008) ("Notably, a claim for *quantum meruit* can only exist in the absence of an enforceable, express contract . . . Therefore, where a plaintiff also alleges breach of contract, *quantum meruit* must be presented as an alternative pleading."); *Loheac v. Children's Corner*

*Learning Ctr.*, 857 N.Y.S.2d 143, 144 (2008) ("Plaintiff was not precluded from bringing an action for breach of contract and, as alternative theories, *quantum meruit* and unjust enrichment").

Here, Defendants' position as to the validity of the NDA has not been explored since Defendants' focus in its Motion to Dismiss and Reply has been the applicability of the Letter Agreement, rather than the NDA, to Plaintiff's claims. (Dkt. No. 19 at 31-33; Dkt. No. 34 at 18-19). Thus, the Court finds that dismissing Plaintiff's *quantum meruit* claim at this juncture of the proceedings would be premature. *See Hiller & Arban, LLC v. Reserves Mgmt., LLC*, 2016 WL 3678544, at *3 (Del. Super. Ct. July 1, 2016) (allowing plaintiff to plead *quantum meruit* claim in the alternative to its contract claims partly because "Defendants have not stipulated to the existence of a valid contract and the instant Motion to Dismiss does not directly respond to H & A's breach of contract allegations."); s*ee also Kammes*, 395 Ill. App. 3d at 522 (finding that, despite breach of contract claim, dismissal of plaintiff's *quantum meruit* claim was "premature" as the lower court "had not considered any evidence . . . concerning the formation of, or performance of, the contract."); *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp. 2d 729, 736 (D.N.J. 2008) (permitting plaintiffs' breach of contract and unjust enrichment claims "to proceed at the motion to dismiss stage, [because] dismissal of one of these claims would be premature," particularly since the facts needed to support a breach of contract claim "must await further proceedings" during discovery). Accordingly, in addition to a breach of contract claim, the Court will allow Plaintiff to plead a *quantum meruit* claim in the alternative.[22]

---

[22] In their Motion to Dismiss, Defendants also argue that dismissal of Plaintiffs' claims is further warranted for failure to name JP Energy St. Croix and ABRH as necessary parties pursuant to Fed. R. Civ. P. 19. (Dkt. No. 19 at 35). This argument is moot, as the three remaining Counts which survive Defendants' Motion to Dismiss—namely Counts II, IV, and VI—all pertain to the NDA, to which JP Energy St. Croix and ABRH are not signatories.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404 will be granted in part and denied in part. Defendants' Motion to Dismiss based on the forum selection clause and Motion to Transfer Pursuant to 28 U.S.C. § 1404 will be denied. The Motion to Dismiss for failure to state a claim will be granted as to Counts I, III, V, and VII with prejudice; granted as to Counts II and IV, without prejudice and with leave to amend; and denied as to Count VI.

An appropriate Order accompanies this Memorandum Opinion.

Date: July 16, 2018                                      _____/s/_____
                                                         WILMA A. LEWIS
                                                         Chief Judge